UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SCOTLYNN USA DIVISION, INC.,

     Plaintiff,

v.                                 Case No:  2:18-cv-521-JLB-NPM

TITAN TRANS CORPORATION,

     Defendant.

_____

## **ORDER**

This matter is before the Court after a three-day bench trial on a claim

brought under the Carmack Amendment to the Interstate Commerce Act.  See 49

U.S.C. § 14706.  Plaintiff Scotlynn USA Division, Inc. ("Scotlynn") is a motor freight

brokerage company, which contracts with others to transport freight throughout the

country.  Defendant Titan Trans Corporation ("Titan") is a motor carrier, which,

from at least May 12, 2014 through September 30, 2016, transported freight by

truck.  The issue is whether Titan is liable to Scotlynn for damage to a cargo of raw

beef (the "Cargo"), where the cardboard containers in which the beef was packaged

tipped over inside the trailer of Titan's truck during transportation.

The Court has considered the pleadings, the testimony of the witnesses, the

documents in evidence, and the parties' joint stipulations.  Being fully advised in

the premises, the Court now makes its findings of facts and conclusions of law as

required by Rule 52 of the Federal Rules of Civil Procedure.[1]  The Court finds that

---

[1] To the extent that any findings of fact are deemed conclusions of law, they

Scotlynn has not established a prima facie case under the Carmack Amendment to recover for the Cargo because there is no evidence that the delivered beef was worthless, and Scotlynn has also failed to prove up a specified amount of damage to the beef.  Further, even if Scotlynn has shown a specified amount of damage to the beef, the damage to the Cargo was caused by the manner in which the shipper loaded the Cargo.  Finally, efforts to mitigate the loss were not reasonable.  For the foregoing reasons, as discussed below, final judgment will be entered in favor of Titan.

I.   FINDINGS OF FACT[2]

A.   CONTRACTUAL RELATIONSHIPS

1.   SCOTLYNN AND TITAN

1.   Scotlynn is a Florida corporation with its principal place of business in Fort Myers, Florida.  Scotlynn provides transportation brokering services and holds a property broker license issued by the Federal Motor Carrier Safety Administration ("FMCSA").

---

are incorporated herein as conclusions of law.   Conversely, to the extent that any conclusions of law are deemed findings of fact, they are incorporated herein as findings of fact.

[2] The Court finds all facts established by a preponderance of the evidence. The Court's citations to the record are not exhaustive; additional portions of the record were considered and relied upon.  To the extent that portions of the record not specifically cited or addressed might support findings contrary to those of the Court, those portions were considered and rejected as not credible or against the weight of the evidence.

2.     Titan is an Illinois corporation with its principal place of business in Hanover Park, Illinois.  At all relevant times, Titan operated as a motor carrier under a license issued by the FMCSA.

3.     On May 12, 2014, Scotlynn and Titan entered into a Broker-Carrier Agreement pursuant to which Titan provided cargo transportation for Scotlynn's customers.

4.     The Broker-Carrier Agreement did not include terms as to specific shipments, such as the identity of shippers or descriptions, origins, destinations, or values of items to be transported.  Instead, the Broker-Carrier Agreement governed the relationship between Scotlynn and Titan by, among other things, establishing non-exclusivity, delineating various delivery terms, and establishing billing arrangements and insurance requirements.

5.     Pursuant to the agreement, Scotlynn and Titan waived inconsistent rights and obligations under the Carmack Amendment.  (Doc. 147-1 at 7-8, ¶¶ 7, 11.)  Titan agreed to be liable for any loss to a shipment as follows:

> Carrier shall be responsible for the proper care and handling of freight moving under this Agreement, and shall be liable to Broker and Broker's Customers for the full actual loss, damage, or injury to property occurring while in the custody, possession or under the control of Carrier, its employees, or its contractors and agents.  For purposes of this Agreement, the term "full actual loss" shall mean the value of the cargo as determined by Shipper.

(Id. at 8, ¶ 11.)

6.     The Broker-Carrier Agreement also required Titan to indemnify Scotlynn and its customers for any "[l]oss, damage or delay in transit as to all goods

3

which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee." (Id. at 9, ¶ 12(c).)  The provision excluded indemnification "contrary to any government law that prohibits indemnification against loss, liability, costs or expenses incident thereto caused by the negligence of such indemnity." (Id. at ¶ 12.)

### 2.   SCOTLYNN AND CARGILL

7.      Cargill, Inc. ("Cargill") is a global food corporation, which owns and operates a facility in Butler, Wisconsin that produces frozen ground beef patties and other food products.

8.      Cargill Meat Logistics Solutions Brokerage Division ("Cargill Logistics") is a division of Cargill that provides transportation, transportation brokering, and related logistical services within Cargill and to outside customers.

9.      On September 25, 2009, Cargill Logistics and Scotlynn[3] entered into a Contract Carrier Agreement, pursuant to which Cargill Logistics as "Broker" agreed to "offer for shipment," and Scotlynn as "Carrier" agreed "to transport in its own equipment" shipments of freight in such amounts and quantities as Cargill Logistics "may tender, subject to availability of suitable equipment." (Doc. 147-68 at ¶ 1.)

10.    Pursuant to the agreement, Cargill Logistics and Scotlynn waived inconsistent rights and obligations under the Carmack Amendment. (Id. at ¶ 5.)

---

[3] The carrier named in the Contract Carrier Agreement is Scotlynn Commodities, but neither party has suggested that this distinction is relevant. (Doc. 147-68 at 6.)

The agreement further provided that Scotlynn would be "liable to the customer or to [Cargill Logistics] as the agent of a claim of a customer, for loss, damage or delay of a shipment received by [Scotlynn] for transportation under the terms of this Agreement." (Id. at ¶ 8.)

11.     Pursuant to the Contract Carrier Agreement, Scotlynn "warrant[ed] . . . that no operations w[ould] be conducted as a . . . broker," and that it would not "assign . . . any of its respective rights or obligations under th[e] Agreement except with prior written consent of [Cargill Logistics]." (Id. at ¶¶ 5, 19.)

12.     Because Cargill Logistics brokers transportation for Cargill, Cargill typically does not require an outside transportation broker. (Doc. 147-141 at 8, Tr. at 26–27.) Cargill does not "double broker loads" to maintain a direct line of communication with, and control over, the transporting carrier. (Id. at 8, Tr. at 27–28.)

13.     Cargill ceased its relationship with Scotlynn after discovering that Scotlynn had brokered shipments without authorization. (Doc. 147-130 at 8, Tr. at 26–27; Doc. 147-141 at 3, Tr. at 8–9.)[4]

### 3.    CARGILL AND FPL

14.     FPL Foods, LLC ("FPL") is a processor of fresh beef products located in Augusta, Georgia.

_____

[4] In its trial brief, Titan argued that Scotlynn violated 49 U.S.C. § 14916 by knowingly participating in an unlawfully brokered shipment. (Doc. 138 at 6-7.) Scotlynn moved to strike the purported defense because it was outside the scope of discovery and the legal issues presented in the final pretrial statement, and the Court granted Scotlynn's motion. (Docs. 142, 146.)

15.     In 2016, FPL sought to build and expand its relationship with Cargill.

16.     FPL executed a contract with Cargill whereby FPL agreed to supply, and Cargill agreed to purchase, approximately 1.2 million pounds of beef (about thirty to thirty-five truckloads) per week.

17.     On September 21, 2016, Cargill purchased 42,147 pounds of beef trim from FPL for $89,823.68.  Beef trimmings are pieces of meat remaining after steaks, roasts, and other cuts are removed.  Cargill intended to use the beef trimmings to make ground beef for hamburger patties at its facility in Butler, Wisconsin.  A "Dispatch Print" prepared by FPL shows that the September 21, 2016 shipment contained eleven combos of one type of beef trim and ten combos of another type.[5] (Doc. 147-27 at 2.)  A "Detailed Pallet Report," also prepared by FPL, listed the twenty-one combos individually, indicating each combo's weight (between 1,780 and 2,166 pounds) and pack date (either September 20 or 21, 2016).  (Id. at 3.)

18.     FPL prepares the bill of lading for its shipments to Cargill using its Straight Bill of Lading Form.[6]  FPL's September 21, 2016 Straight Bill of Lading for the Cargo (the "Bill of Lading") named FPL as the "shipper" and Cargill as both the

---

[5] Briefly, a "combo" is a type of cargo container.  A combo is fully described in Section I, C, infra.

[6] "A bill of lading records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage."  Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 18–19 (2004).  A "straight" bill of lading is a non-negotiable bill of lading, which provides that the transported goods are the property of a specified individual or entity, usually the buyer.  See BUSINESS TRANSACTIONS SOLUTIONS § 123:4.

consignee[7] and the "carrier."  (Id. at 1.)  Essentially, this arrangement required Cargill to provide its own transportation from FPL's facility in Georgia to Cargill's facility in Wisconsin.

### B.   TRANSPORTATION ARRANGEMENTS

19.    Cargill hired Scotlynn to transport the Cargo pursuant to the Contract Carrier Agreement.  Richard Miller, a Cargill Logistics senior logistics broker, contacted Richard Sowell, a Scotlynn logistics account manager, to arrange transportation.

20.    Mr. Miller believed that Scotlynn would transport the Cargo itself. Unbeknownst to Mr. Miller or anyone at Cargill, however, Mr. Sowell hired Titan to transport the Cargo on Scotlynn's behalf.

21.    Cargill became aware of Scotlynn's brokering of the Cargo after Cargill rejected the Cargo and a claim was filed to recover for the loss.

### C.   FPL'S PACKAGING AND LOADING OF THE CARGO[8]

22.    FPL packages its beef for shipment in cardboard bins called combos.

23.    To make the outer packaging of a combo, an FPL employee connects interlocking flaps on a flat piece of cardboard to create the bottom of a barrel-shaped container.  The pieces of cardboard are pre-banded with horizontal

---

[7] A "consignee" is the "party designated to receive a shipment of goods." Norfolk S. Ry. Co. v. Groves, 586 F.3d 1273, 1281 (11th Cir. 2009).

[8] The findings in this section are based primarily on the testimony of Jerry Lowe, FPL's shipping manager, but also incorporate testimony from several other witnesses.

black fiber or plastic straps woven into the cardboard for reinforcement around the sides of the bin.  The bottom of a combo has no additional reinforcement; the combo's design relies on the weight of the meat to keep the interlocking flaps connected.

24.     A plastic liner or bag is placed inside the assembled cardboard container, and the meat is sealed inside the bag.  The containers are then capped with plastic pieces (sometimes a double layer is used), which are secured to the outside of the container with white tape.

25.     The assembled combos are placed on wooden pallets, 40 x 48 inches in size, one combo per pallet.  Pallets allow the combos to be loaded onto and unloaded from a truck using a forklift.  The size of a combo varies, and its circumference may reach the outer edges of the pallet or leave as much as four inches between it and the edge of the pallet.  No additional anchors or straps are used to secure the combos to the pallets.  The combos are free-standing, relying on their weight (about 2,000 pounds) to prevent them from shifting on top of the pallet it occupies during transit.

26.     FPL stages shipments of beef inside an enclosed refrigerated warehouse.  Each combo/pallet combination in the shipment is arranged on the floor of the staging area in the position in which it will be loaded onto the truck.  FPL uses a loading diagram form to identify each pallet in the shipment and map out the location inside the trailer in which it will be placed.

27.     For safety reasons, the transporting truck driver is not allowed in FPL's enclosed loading area.  The truck driver is instructed to back the trailer up to the loading dock and remain either in the cab of the truck or outside the enclosed loading area while FPL employees load the shipment.

28.     When the loading process is complete, an FPL employee will instruct the driver to pull away from the loading dock and meet the FPL employee at the rear of the truck.  The doors of the trailer will be open, and the driver has the opportunity to look inside the truck's trailer.  The doors of the trailer are then closed, and the FPL employee will place a seal on them.  Once the trailer is sealed, the driver is not permitted to open it or break the seal prior to the receiving entity instructing the driver to do so at the destination.

29.     After the trailer is sealed, the FPL employee will hand the truck driver documentation, which includes the bill of lading, and direct him to proceed to the check-out gate.

D.     TITAN'S PICK-UP OF THE CARGO FROM FPL

30.     Scotlynn issued Titan a Carrier Confirmation for pick-up of the Cargo on Wednesday, September 21, 2016.  (Doc. 147-21 at 1.)  The confirmation indicated that the Cargo was "Fresh Meat," that it required a 53-foot reefer truck, that the temperature in the reefer had to be at a specified level and "continuous," and that the trailer must be sealed with the seal number written on the bill of lading.  (Id.) No requirements as to the securing of the Cargo were included in the Carrier Confirmation.  (Id.)

31.     Titan's truck driver was the only testifying witness with personal knowledge as to what occurred when he picked up the Cargo at FPL's facility.  The Court finds the truck driver's testimony credible.  His testimony was generally consistent with FPL's standard operating procedures, as testified to by FPL employees and described above.[9]

32.     The truck driver testified that he was instructed to back the trailer to the loading dock and remain outside the enclosed loading area while FPL loaded

---

[9] Scotlynn attempted to discredit the truck driver on cross-examination by addressing an affidavit he signed in support of Titan's motion for summary judgment, purportedly in contradiction with his later deposition testimony.  In the affidavit, the driver averred that: (1) FPL "load[ed], secure[d], and seal[ed] the beef cargo onto the trailer without [the driver's] supervision or participation"; (2) the driver "could not view the loading of the beef, could not verify how it was secured, and could not open the trailer after loading"; and (3) the driver had "no personal knowledge of loading and securing techniques used by FPL Food and was not permitted to partake in securing the load."  (Doc. 147-122 at ¶¶ 5-9.)  The Court finds that, with one minor ambiguity (note 10, infra), the driver's affidavit is consistent with his deposition testimony and the testimony of Jerry Lowe regarding FPL's standard procedures.

Additionally, Scotlynn questioned the truck driver and the notary public who notarized the affidavit, the wife of Titan's owner, about purported improprieties in the affidavit's drafting and execution.  The Court finds no evidence of impropriety: the notary worked in Titan's office; the driver's native language is Polish, and he does not read or write English; and the notary, who speaks English and Polish, explained to the driver in his native language the contents of the affidavit before he signed it.  Scotlynn's cross-examination did not reveal any reason to question either witness's testimony that a good faith effort was made to explain the substance of the affidavit, even if a word-for-word translation was not attempted or possible due to language differences.  Further, Scotlynn's suggestion of impropriety based on the possibility that Titan's attorney drafted the affidavit is unpersuasive.  See Russell v. Acme-Evans Co., 51 F.3d 64, 67 (7th Cir. 1995) ("Almost all affidavits submitted in litigation are drafted by the lawyers rather than by the affiants . . . .").

and secured the Cargo in the trailer.  The truck driver remained inside the cab of the truck and was unable to observe the loading process.

33.     When loading was completed, the driver was instructed to pull the trailer away from the loading dock.  He did so, exited the cab of the truck, and walked to the rear of the trailer where an FPL employee was waiting.  The doors were ajar when the driver arrived at the back of the trailer, but an FPL employee was in the process of closing the door on one side.  The driver helped the employee by shutting the door on the other side.[10]

34.     The driver testified that he looked briefly inside the truck before the doors were closed and saw that the trailer contained cardboard packages.  He could not see how the Cargo was loaded or what was inside the cardboard containers.  He did not attempt to inspect how the Cargo had been loaded because: (1) he believed the FPL employee intended for him to close the doors immediately; (2) he would have had to enter the trailer and believed that was not allowed by FPL; and (3) he did not think the circumstances required him to inspect the manner in which the Cargo was loaded because experienced FPL employees performed the task and did not allow him to participate or even observe as the Cargo was loaded.

---

[10] The only inaccuracy in the driver's affidavit, as demonstrated by his later deposition testimony, relates to when and how the trailer doors were closed.  The affidavit stated that the driver "could not open the trailer after <u>loading</u>," suggesting that the doors were already shut when the driver was called back by the FPL employees after loading was completed.  But the affidavit contained only an ambiguity as to whether the doors were open for any length of time between loading and sealing, and that ambiguity was later clarified at the driver's deposition.

35.     The gist of the driver's testimony was that he never had a meaningful opportunity to inspect the Cargo or the manner in which it was loaded during the brief period in which the doors were open before the seal was placed by FPL's employee, and that he relied on FPL's assumption of responsibility for the loading by virtue of its policies that excluded him from participating in the loading.  The Court finds that testimony both credible and reasonable.

36.     According to Jerry Lowe, FPL's shipping manager, FPL's standard practice of not allowing the driver to be present during the loading process did not mean the driver had no opportunity to inspect the manner in which the Cargo was loaded.  For instance, Mr. Lowe suggested that if a driver could not discern how cargo was loaded from his eye-level position as he looked into the trailer through the open doors, a driver could climb on top of the truck and lie on his stomach with his head hanging over the edge to look inside the trailer.

37.     After the trailer doors were closed, the FPL employee attached the seal.[11]  The FPL employee handed the driver the Bill of Lading.[12]  While the Bill of Lading designated FPL as the "Shipper" and Cargill as the "Consignee (Sold To)" and "Carrier," it did not reference Scotlynn or Titan.  (Doc. 147-27 at 1; Doc. 147-31.)

38.     Whether the driver signed the Bill of Lading is disputed.  The copy of the Bill of Lading admitted as evidence does not have the driver's signature, and the driver testified that he did not sign the Bill of Lading.  Scotlynn, however, presented testimony that FPL's standard practice was to require all truck drivers to sign a bill of lading before they could leave FPL's facility.[13]  Scotlynn argues the

---

[11] One of the pictures taken upon the Cargo's delivery to Cargill shows a device called a load lock at the back of the truck, which had fallen on one side.  (Doc. 147-38.)  No testimony was presented to establish who placed the load lock in the trailer or when it was placed.  FPL's standard policies and practices require the truck driver to provide the load lock, and FPL personnel would install it during the loading process.  If the load lock is not in place when the trailer is turned over to the driver after loading is completed, the driver is supposed to either install it himself or request FPL personnel to do so.  A load lock is a securing device used to prevent cargo from shifting to the back of the trailer during transportation and possibly falling onto the receiver when the trailer doors are opened.  The weight of the testimony, however, reflects that load locks are not necessary for shipments of beef, and neither party presented evidence reflecting that the Cargo loss was caused by an improperly installed load lock.

[12] There was testimony that, in addition to the Bill of Lading, the truck driver would have been given a copy of the Dispatch Print and Detailed Pallet Report.  But there was no testimony as to whether that occurred here.  The driver only mentioned receipt of the Bill of Lading.

[13] The truck driver further testified that although he would sometimes sign a bill of lading, for instance, if the shipper asked him to, the shipper would not always ask him to sign.  (Doc. 147-123 at 9, Tr. at 30–32; Doc. 147-124 at 4, Tr. at 62–63.)

Court should infer from this standard practice that the driver signed the Bill of Lading and that the reason his signature does not appear on the admitted Bill of Lading is that the signature was inadvertently cut-off from the bottom of the original Bill of Lading when a copy was made for FPL's files.

39.     The Court finds the testimony regarding FPL's standard procedures insufficient to establish that the driver signed the Bill of Lading since he testified he did not, and the Court credits the driver's testimony.  Furthermore, the original Bill of Lading is not in evidence, and the driver's signature does not appear on the copy that is in evidence.  There was no witness with personal knowledge to dispute the driver's testimony that he did not sign the Bill of Lading.  Absent such evidence, the Court finds that it would be speculation to conclude based on FPL's standard procedures that the driver signed the Bill of Lading.

40.     It is industry custom for a carrier to insert in the bill of lading the words "shipper load and count," or "SLC," when the cargo is loaded by the shipper. The driver did not do so here.

41.     There is no evidence to the contrary, and Titan concedes, that all twenty-one combos were in good condition at the time FPL loaded them onto the truck.

### E.     THE CONDITION OF THE CARGO WHEN REJECTED BY CARGILL

42.     The Cargo arrived at Cargill's facility in Butler, Wisconsin between 12:00 p.m. and 1:00 p.m., Friday, September 23, 2016.

43.     A Cargill employee in the shipping and receiving department of the

facility directed the truck driver to break the seal and open the trailer doors.  When

the doors were opened, it was discovered that some of the combos had tipped toward

the front of the truck.  As a result, Cargill refused to accept delivery of the Cargo.

44.     It is undisputed that the decision to reject the Cargo was made by

unidentified Cargill personnel in the shipping and receiving department of the

Butler facility.  The unidentified Cargill personnel took photographs of the Cargo as

seen from the open doorway at the rear of the truck.[14]

45.     Tamara Stegman, manager of Cargill's OS&D Department,[15] testified

that Cargill rejected the Cargo because there was damage to some of the cardboard

packaging containing the beef due to the combos shifting during transport.  This

---

[14] The record contains eight photographs of the Cargo at the time of delivery, and three photographs taken by Titan's driver with his cell phone. (Docs. 147-32, 147-33, 147-34, 147-35, 147-36, 147-37, 147-39, 147-40, 147-41, 147-42, 147-43.) Scotlynn made an oral motion at trial to compel Titan to produce additional photographs of the Cargo, which were purportedly taken by Titan's owner, Walter Borawski, on or about the Friday after the Cargo was rejected but were withheld during discovery.  Scotlynn believed additional photographs existed because of a notation in the insurance adjuster's file indicating that the adjuster had directed Mr. Borawski to open the re-sealed trailer while in Titan's yard and take photographs to send to the adjuster.  An email to the adjuster from Mr. Borawski around this time had three photographs attached, but they were the photographs taken by the driver on the day of delivery.  Mr. Borawski's testimony as to whether he had taken additional photographs was somewhat confused.  The Court finds that any discrepancies in his testimony on that issue were due to faulty memory and not intentional deception.  Because all the record evidence suggests that the photographs Mr. Borawski sent to the adjuster were the three photographs taken by Titan's driver, the Court found that there were no additional photographs and, accordingly, denied Scotlynn's oral motion to compel.

[15] "OS&D" stands for Overage, Shortage, and Damage, the department within Cargill that handles delivery issues.

damage and shifting made it impossible for Cargill to use a forklift to unload all the combos without further damaging the packaging and risking contamination of the beef inside. This testimony is supported by the photographs and emails and claim forms prepared around the time of Cargill's rejection. (See, e.g., Doc. 147-60 (FPL Claim Form describing the loss as "[a]ll combos were shifted forward/partially off pallets," and "[s]ome or all combos have busted bottoms").)

46.     As discussed below, the Court finds that the evidence shows damage to the packaging of some combos, but there is no evidence that the beef inside any of the combos was damaged as a result of the damage to the packaging.

### 1.     THE ONLY DAMAGE SHOWN IN PHOTOGRAPHS IS TO THE COMBOS' OUTER PACKAGING

47.     The photographs and related witness testimony does not establish by a preponderance of the evidence that the outer cardboard packaging was ripped or damaged other than on the two combos described below, that any of the plastic bags inside the cardboard packaging were punctured, torn, or ripped, or that any beef was exposed or otherwise contaminated:

(a)     The photographs of the Cargo show that the combo to the right side of the trailer closest to the door did not shift and appears to be completely intact with no damage to any part of the packaging.

(b)     The photographs show that many of the remaining combos (although specifically how many is unclear) had shifted on their pallets toward the front of the truck, and some were tipped forward rather than standing straight on the pallets. The pictures also show that the plastic inside some of the combos may

16

have been protruding slightly over the top of the cardboard container, likely from the sides of those containers having been compressed by the weight of other combos falling against them.  (See, e.g., Doc. 147-139 at 20, Tr. at 73–76.)  The fact that the plastic was protruding over the top suggests that the plastic caps on those combos were loosened or no longer completely secured with the white tape, but this is not clear from the photographs, except as to the two combos described below.

(c)    Damage to the outer cardboard packaging is observable as to two combos: (i) the combo to the left side of the trailer closest to the door, which tipped forward to such a degree that the interlocking flaps on the bottom of the outer cardboard packaging came undone, exposing the blue inner plastic bag containing the beef; and (ii) a combo located in the second row from the back on the right side, which is tipped forward and its outer cardboard packaging split open at the bottom, exposing the blue inner plastic bag containing the beef.  (Docs. 147-34, 147-38.)  The photographs also show that the white tape securing the plastic caps on these combos was broken.

48.    The photographs do not show whether any of the sealed bags inside the containers were broken, torn, or ripped.

49.    No witness testified that they personally viewed the Cargo when it first arrived at Cargill's facility.  Thus, the testimony concerning whether any of the cardboard boxes were saturated with moisture or were broken was based on the witness looking at the photographs taken at the time of delivery.  Several witnesses testified—and the Court agrees—that what appears in one or two photographs to be

discoloration of the cardboard on the damaged combo to the right could just as easily be a shadow rather than moisture.[16]  Similarly, some witnesses testified that the photographs showed leakage of blood from the meat, while others testified they could not discern whether there was blood on the floor of the trailer or areas of darkness or shadows from the lighting.  There is no evidence as to whether it is possible for moisture or blood to leak from plastic bags that remain sealed and intact, or whether the refrigeration unit in the truck could have been the source of moisture or liquid accumulation on the floor of the trailer.

### 2. CARGILL DID NOT HAVE THE BEEF INSPECTED FOR CONTAMINATION BY A FOOD SAFETY EXPERT

50.    Cargill's on-site quality assurance team and inspectors from the United States Department of Agriculture ("USDA") can assess whether a particular shipment is potentially or actually contaminated as a result of transportation. Cargill employee, Ms. Stegman, testified that she would expect that an inspection was done here, but no food safety report concerning the Cargo was presented at trial.  Jason Middleton, Manager of Cargill Logistics, also testified that shipping and receiving personnel would normally consult with a "regulatory group to decide if the load can be accepted or if it needs to be rejected."  (Doc. 147-141 at 5, Tr. at 16.)[17]  But there is no evidence that the unidentified Cargill personnel who actually

---

[16] This is especially true given that the discoloration is not apparent in photographs taken from different angles where the lighting may have been different.

[17] Mr. Middleton was asked what he would "expect Cargill's Receiving Department to do" if he "saw the beef arrive looking like it does" in the photographs in this case, and his response was that he "would have to definitely call in a team

rejected the Cargo sought out a food safety expert or other regulatory group before or after making that decision.

51.     Ms. Stegman and others testified that the beef was potentially exposed, which presented a contamination issue.  But the facts do not establish that a seal was broken on every combo or that easily spoiled perishables were exposed to improper temperatures over a lengthy period of time.  In those circumstances, it might not be possible to determine with any degree of certainty whether the condition of the goods presents a risk of contamination or spoilage.  Here, the risk could be determined upon further investigation into whether the plastic bags in which the beef had been sealed were still intact.

52.     In sum, the Court credits Mr. Middleton's testimony, which best summarizes the condition of the Cargo on delivery: the outer packaging of some combos was damaged, but whether the damaged packaging presented a food safety concern required further investigation to determine if there was any exposed beef, and, if so, a food safety report regarding the risk of contamination.

### 3.    MOST OF THE BEEF COULD HAVE BEEN REDELIVERED AFTER REWORKING THE PACKAGING

53.     In addition to the absence of evidence showing damage to or contamination of the beef, the record includes evidence affirmatively showing that the beef was not damaged when it was delivered to Cargill.

---

and decide whether the load could be accepted or not." (Doc. 147-141 at 6, Tr. at 18.)

54.     This evidence includes the testimony of Scotlynn's witnesses, Messrs. Sowell, Kollker, and Marrapese,[18] all of whom testified that if Titan's driver had returned the Cargo to FPL on Friday there would have been no loss to the Cargo. From this testimony the Court infers that the beef was salvageable for human consumption, and that it was not the shifting that occurred during transit that caused the loss but rather the failure to timely return the Cargo to FPL.

55.     The Court also gives great weight to the testimony of Jerry Lowe, a former FPL employee, on this point.  Mr. Lowe testified that the load of beef as shown in the photographs was not "damaged, because you could salvage that load." (Doc. 147-139 at 21, Tr. at 79.)  Mr. Lowe testified that, so long as it was done in a timely manner, almost all the beef in the combos could be removed and repackaged for human consumption, with a loss of about 20 to 30 pounds per combo.  (Id. at 21, Tr. at 78–80.)

56.     FPL had the ability to "rework" the Cargo in the manner described above at its facility in Georgia.  The Court accepts Ms. Stegman's testimony that Cargill did not have the same capability.  But the Court rejects as not credible any inference from Ms. Stegman's testimony that the only option for reworking was to return the Cargo to FPL, as that would ignore other options available to Cargill, such as obtaining the services of a local company to unload or rework the combos. (See note 25, infra (discussing Doc. 147-61); Doc. 147-75 at 30-31.)

---

[18] Joe Marrapese is Scotlynn's claims director, while Kevin Kollker is Scotlynn's Director of Operations, who was responsible for overseeing and monitoring claims.

### F.   DISPOSITION OF THE REJECTED CARGO

#### 1.   UNEXECUTED PLAN TO RETURN THE CARGO TO FPL

57.     After unidentified Cargill personnel rejected the Cargo, the doors of the trailer were closed and Cargill personnel placed a new seal on the trailer.  They wrote "Rejected" and "Load Shifted" on the Bill of Lading and returned it to Titan's driver.  (Doc. 147-31.)

58.     Cargill's rejection of the Cargo was finalized at about 4:30 p.m. on the day it was delivered, Friday, at which time the driver communicated with Titan's dispatcher for instructions about what to do with the Cargo.  Titan's dispatcher instructed the driver to bring the trailer to Titan's yard in Batavia, Illinois.

59.     The Court finds that Scotlynn's employee, Mr. Sowell, knew or could have discovered the location of the Cargo on Friday evening, and rejects as lacking in credibility any testimony to the contrary.  Mr. Sowell was in charge of directing Titan as to the Cargo once it was rejected by Cargill.  He spoke with Titan's dispatcher around 4:30 p.m., which was before he received any instructions from Cargill about the Cargo.  The Court finds that he therefore likely directed Titan's dispatcher to have the driver take the truck to Titan's yard while details regarding the Cargo's disposition were decided.  Even absent instructions from Mr. Sowell to bring the truck to Titan's yard, Titan's actions were reasonable.  Mr. Sowell testified that he knew the Cargo was in Titan's truck and that the truck was parked in Titan's yard.  At trial, the Court observed Mr. Sowell giving evasive responses when asked whether he knew where Titan's yard was located, but there is no

evidence that, if he did not know, he could not have found out from Titan's dispatcher if he had asked.  In fact, the Court intervened at one point and squarely asked Mr. Sowell to answer the questions being asked, as he continually evaded answering seemingly straightforward questions.  In all events, Mr. Sowell eventually admitted that the Cargo was under his control from Friday evening through the weekend.

60.     Upon being notified that the Cargo had shifted in transit, FPL agreed to accept redelivery of the Cargo.  As a result of communication with FPL, Ms. Stegman made the decision to return the Cargo to FPL.  It is undisputed that, at about 6:00 p.m. on Friday, either Ms. Stegman or Mr. Miller directed Mr. Sowell to return the Cargo to FPL in Georgia.[19]

61.     After receiving Cargill's instruction to return the Cargo to FPL, Mr. Sowell instructed Titan to do the same.  Titan informed Mr. Sowell, however, that the driver who delivered the Cargo could not return to Georgia until Monday, September 26, because he reached the limit for the number of hours he could legally

---

[19] Mr. Sowell testified he was instructed to return the Cargo to FPL by Mr. Miller, but Mr. Miller denied he did so, stating that he only turned the matter over to OS&D.  (Doc. 147-130 at 11,  22, Tr. at 38–40, 83–84.)  There is no testimony from Ms. Stegman regarding communications on Friday with Mr. Sowell or any other Scotlynn employee.  Ms. Stegman would not have communicated with Titan because she, like Mr. Miller, did not know of Titan's involvement in the shipment at the time.

drive without a rest.[20]  Titan had no other drivers available to leave for Georgia

earlier than Monday afternoon.[21]

62.    By his own admission, Mr. Sowell did not know on Friday or over the

weekend that there would be a shelf-life issue if the Cargo did not arrive in Georgia

by Monday.  Messrs. Kollker and Marrapese also testified as to their lack of

knowledge on this issue.  Because Messrs. Sowell, Kollker, and Marrapese did not

know about the shelf-life issue that ultimately caused FPL to refuse redelivery of

the Cargo, the Court finds that their collective, and somewhat spurious, testimony

that Titan was warned by Scotlynn on Friday that the Cargo would be a total loss if

the driver waited until Monday to leave for Georgia is simply not credible.[22]

---

[20] Hours of service regulations can be found on the FMCSA's website, https://www.fmcsa.dot.gov/regulations/hours-of-service.  Scotlynn challenged the asserted basis of the driver's unavailability by noting that Titan had not retained the driver's driving logs to prove he reached the hours limit.  The Court will not draw any unfavorable inference on this basis, however, because the evidence showed that Titan disposed of those logs as part of its routine procedures once the retention period required by federal law had expired, and there is no evidence that any issue as to those logs had been raised before that time.

[21] Scotlynn attempted to discredit Titan on the issue of driver availability with testimony that the reset period after a driver reaches the hours limit is thirty-six hours, and that Titan's driver therefore could have left for Georgia over the weekend.  This testimony was speculative as there was no evidence to prove the applicable federal rules regarding driver hours or to demonstrate the particular driver's availability over the weekend.  In any event, there was neither evidence that Scotlynn discussed this possibility with Titan nor, if so, that Titan rejected it.

[22] An internal dispatch note created by Mr. Sowell stated that he told Titan on Friday that if Titan did not return the Cargo by Monday there would be a full loss claim.  This statement was added to Scotlynn's dispatch notes on September 30, a week _after_ the purported conversation.  The note is not credible because, by September 30, FPL had refused to accept redelivery and Mr. Sowell had a motive to blame Titan for the Cargo loss.

63.     As a motor carrier, Titan was not an expert in the use or processing of raw beef and did not have independent knowledge of the shelf-life of the contents of the Cargo.  The Court finds that Titan reasonably believed there was no need to leave before Monday to return the Cargo to FPL, so long as the refrigeration unit in the trailer continued to run.  Mr. Sowell did not tell Titan otherwise on Friday or over the weekend.  Nor did he tell Titan that FPL would refuse redelivery if the Cargo did not arrive by Monday, because, as previously noted, Mr. Sowell was unaware of that fact at that time.

64.     Titan reasonably believed from its dispatcher's conversations with Mr. Sowell on Friday evening that Mr. Sowell agreed with Titan's proposal to return the Cargo to Georgia when its driver was available, which meant departing on Monday and arriving at FPL on Tuesday.

65.     Mr. Sowell's testimony that Titan refused to cooperate with returning the Cargo to FPL by leaving on Friday is not, in the Court's judgment, credible. Titan did not refuse to take Mr. Sowell's phone calls.[23]  Nor did Titan refuse to cooperate in Scotlynn repowering the trailer.[24]

---

[23] The truck driver did not speak English, was not the decision-maker for Titan, and was not working that evening.  Under these circumstances, the driver's failure to answer Mr. Sowell's calls to his cell phone did not constitute a refusal to take Mr. Sowell's calls.  The fact that Titan's owner was also not available to speak with Mr. Sowell on Friday similarly does not show lack of cooperation by Titan. Cargill's senior logistics broker testified that shippers typically communicate with dispatchers (Doc. 147-130 at 25, 29, Tr. at 94, 112), and the evidence shows that Mr. Sowell spoke with Titan's dispatcher on at least four occasions between 5:55 p.m. and 10:30 p.m. Friday evening.

[24] According to Scotlynn, "repowering the trailer" meant hiring a driver from a different carrier to return the Cargo to Georgia by connecting the trailer

66.     While there is some evidence that Scotlynn was frustrated with Titan over plans for the return trip to FPL, that frustration was expressed internally in an email discussion a few days later, on Monday morning.  But Scotlynn's frustration with Titan as shown in the email discussion related not to Titan's purported refusal to return the Cargo to FPL on Friday, but with Titan's expectation that it would get paid an additional fee for the return trip.  (Doc. 147-61.)  Significantly, and it bears repeating, the discussion occurred before Messrs. Sowell, Marrapese, and Kollker learned from Ms. Stegman that it was too late to return the Cargo to FPL.  Mr. Marrapese suggested several options for the Cargo's disposition that would not have included a return trip to FPL or required payment to Titan.[25]  Ultimately deciding not to risk a total loss to the Cargo by playing "hardball" with Titan over the terms of a return trip to Georgia, Mr. Kollker took steps on Monday morning toward redelivery by issuing Titan a formal rate

---

containing the Cargo to the other carrier's truck.  Mr. Marrapese testified unconvincingly that Titan was hiding the location of the truck from Mr. Sowell, which prevented Scotlynn from arranging for the trailer to be repowered, an assertion the Court finds to be untrue.  Mr. Borawski testified that Titan could not repower the trailer because doing so would require trailer interchange insurance, which Titan did not have.  Mr. Sowell testified that if Titan would have agreed to repowering the trailer, he could have obtained the necessary insurance for Titan. The Court rejects this testimony as speculative as there is no evidence that Mr. Sowell made any effort to obtain the insurance.  In any event, the Court finds this testimony not credible as to Titan's purported lack of cooperation because there is no evidence that Mr. Sowell offered Titan the option of Scotlynn purchasing the necessary insurance for Titan, let alone that Titan rejected such an offer.

[25] The options included: (1) finding a local company to rework the Cargo for redelivery; (2) salvaging the product; and (3) insisting that Titan transport the Cargo to Georgia at no charge, with the risk that Titan would refuse and the Cargo would be declared a total loss.  (Doc. 147-61 at 1.)

confirmation to return the Cargo to FPL for $2,600, leaving that Monday afternoon with arrival at FPL on Tuesday afternoon.

67.     Shortly after Scotlynn made these arrangements with Titan, Ms. Stegman emailed Mr. Sowell for an update of the driver's location and expected arrival time, apparently under the belief that the driver had left Friday or over the weekend to return the Cargo to FPL.  Mr. Sowell told Ms. Stegman that the truck was about to leave and would arrive at FPL the next day.  Mr. Sowell's response clearly shows that he was unaware that Cargill's redelivery arrangements with FPL required the Cargo to arrive at FPL by Monday.

68.     When Ms. Stegman received Mr. Sowell's response, she instructed him to put a hold on the return trip.  She then reached out to FPL, which responded that it would not accept a return of the Cargo on Tuesday.  Ms. Stegman was told to send FPL a blank claim form so FPL could submit a claim to Cargill for the Cargo loss and that Cargill, in turn, should notify its insurance carrier of the loss.  Upon receiving this information from FPL, Ms. Stegman instructed Mr. Sowell to cancel the return trip to Georgia, stating that "the meat will be too old upon arrival."

### 2.     EFFORTS TO MITIGATE ONCE FPL REFUSED REDELIVERY OF THE CARGO

69.     Following cancellation of the Cargo's return to FPL, Ms. Stegman instructed Mr. Marrapese to attempt to find a buyer for the Cargo.  The evidence shows that Mr. Marrapese's mitigation efforts on Monday afternoon were minimal.

70.     Having not found a buyer for the Cargo on Monday afternoon, Mr. Marrapese informed Titan on Tuesday that Scotlynn was submitting a claim

26

against Titan for total loss of the Cargo, explaining that the Cargo "needed to be brought back to GA" but because it "sat over the weekend its shelf life became a factor, which resulted in the inability to salvage." (Doc. 147-70 at 1.)  Mr. Marrapese directed Titan to take responsibility for disposing of the Cargo.[26] (Id.)

71.    Titan reported a cargo loss claim to its insurance carrier, Lancer, on Wednesday, September 28.  The insurance adjuster instructed Titan to keep the Cargo in the resealed trailer in its yard with the cooling unit running.

72.    FPL's Senior Vice President of Sales and Supply Chain, Antoine Bernier, testified that FPL's shelf-life guarantee, reflected in its declared "use by" date, is seven days from the date on which the beef was packaged.  If the beef is not consumed by that date, it may still be used for human consumption, but typically is sold at a discounted price.  The amount of the discount varies, and usually a USDA or quality control person performs organoleptic testing to determine whether the meat was still useable, in which case the meat would be frozen and resold at a discount.  (Doc. 147-140 at 5–6, Tr. at 16–17.)

73.    On September 27, 2016, when Mr. Marrapese declared the Cargo a total loss and abandoned it to Titan, he did not know and had not sought out information about FPL's guaranteed shelf-life for the Cargo.  Had he done so, he would have learned that eight of the combos in the Cargo had an FPL "use by" date

---

[26] Mr. Marrapese's abandonment of the Cargo to Titan appears to have violated Cargill procedures, which provide that carriers are not permitted to dispose of product without Cargill's supervision due to food safety concerns associated with introducing rejected loads into the market.  (Doc. 147-141 at 7, Tr. at 24.)

of September 27 and thirteen had a "use by" date of September 28.  (Doc. 147-88 at 2-3.)  In other words, on the date Scotlynn declared the Cargo a total loss, the beef was likely still fit for human consumption, although perhaps worth less than its original invoice price due to the passage of time.

74.     On Thursday, September 29, Lancer communicated with Mr. Marrapese about federal regulations that Lancer believed required Cargill to accept the Cargo in its damaged condition.  Lancer requested Mr. Marrapese to arrange to have the Cargo redelivered so that Cargill could mitigate its damages as required by law before filing a claim with the insurance carrier.  Mr. Marrapese declined Lancer's request, responding that the Cargo was a total loss and therefore Cargill had no duty to mitigate.

75.     On Friday, September 30, following unsuccessful efforts to have Scotlynn and Cargill take over mitigation efforts, Lancer retained a salvage company to find an appropriate disposition for the Cargo.  On October 4, 2016, the salvage company sold the Cargo to a third party for use as animal food at a price of $7,586.46.  On or about October 18, 2016, the insurance company received $4,636.17 from the salvage company as the salvage net proceeds.  (Doc. 147-75 at 24.)

G.     CLAIMS AND PAYMENTS RELATED TO THE CARGO LOSS

76.     On or about Monday, September 26, 2016, FPL, as the "owner of the cargo," submitted a claim for the Cargo's full invoice price of $89,823.68 to Cargill, which it designated the "carrier."

77.     Ms. Stegman testified that Cargill paid FPL $89,823.68 for the Cargo. She provided no further details, but it appears that payment might have been made on or about September 28, 2016.  (Doc. 147-23.)

78.     The parties have stipulated that Cargill submitted a claim to Scotlynn for the Cargo in the amount of $89,823.68.  (Doc. 144 at ¶ 12.)  There is no evidence in the record showing when the claim was submitted.  The evidence shows that Scotlynn issued a check to Cargill in the amount of $89,823.68 on November 4, 2016.  (Id. at ¶ 13; Doc. 147-86.)

79.     The record contains an FPL "Debit Memo," dated November 25, 2016, in the amount of $89,823.68, listing a transaction date of November 23, 2016 and the description "Cargill Claim."  (Doc. 147-96.)  Mr. Bernier testified that the Debit Memo was an internal document generated by FPL's accounting department for the purpose of giving Cargill a credit for the Cargo loss.  (Doc. 147-140 at 6, 8, Tr. at 17–19, 26–28.)

80.     On or about February 27, 2017, Lancer sent Cargill or Scotlynn a check for $4,636.17, representing the salvage payment Lancer received for the Cargo.  (Doc. 147-75 at 28.)

81.     In March 2017, the check was returned to Lancer with "void" written on the back.

82.     In April 2017, Lancer requested Mr. Marrapese to provide instructions on where to send the salvage proceeds.  The parties have stipulated that "Lancer paid FPL $4,636.17 for the salvage."  (Doc. 144 at ¶ 10.)

29

83.     Based on the above facts, it appears that Cargill may have recovered for the Cargo twice—from Scotlynn's check on or about November 4, 2016 and as credit from FPL on or about November 25, 2016.  It also appears that Mr. Marrapese directed Lancer to pay the salvage proceeds to FPL because FPL credited Cargill for the Cargo.  Although the salvage check represents partial payment for the Cargo loss and Scotlynn appeared to direct the partial payment to FPL, Scotlynn has not credited Titan for that partial payment.  Instead, Scotlynn seeks recovery of the full $89,823.68 invoice value of the Cargo.

### H.   CAUSE OF THE CARGO DAMAGE

84.     Scotlynn contends that the combos shifted and tipped during transit because the truck driver applied excessive or extreme pressure to the brakes.  The driver testified that nothing unusual happened during the drive from Georgia to Wisconsin and that he never felt any movement inside the trailer.

85.     There is no evidence that Titan's truck driver used the brakes in an unusual fashion because of improper or reckless driving on his part.  The Court finds that hard, and possibly even extreme, braking is a normal part of driving in circumstances beyond the driver's control, such as when encountering an unanticipated event.  Something more than extreme braking or the mere fact that the combos shifted is required to find that the driver was negligent.  Cf. Lapuyade v. Pac. Emp. Ins. Co., 202 F.2d 494, 497 (5th Cir. 1953) ("Evidence that the truck swerved slightly when the brakes were suddenly applied in an emergency does not of itself establish negligence on the part of the truck driver.").

86.     Thus, while basic laws of physics support a finding that the Cargo shifted because of driver braking, there is no evidence from which the Court can infer that any <u>excessive</u> braking was the result of the driver's negligence or improper driving.

87.     Several witnesses testified that the weight of the combos would prevent them from shifting in the truck, even without straps or other methods to secure them to the pallets.  Other witnesses, including Mr. Middleton, testified that was not necessarily true, and that hard braking could cause the combos to move despite their weight.  Obviously, the weight of the combos was insufficient in this instance to prevent the Cargo from shifting.  Braking is necessary during transportation.  It would make sense that, to prevent forward shifting of cargo, bracing or straps would be added to the combos to secure them to the pallets.  But the testimony in general supported a finding that it was within normal industry practices to rely on the weight of the combos to prevent shifting during transit.

88.     Despite an industry practice to rely on the weight of beef to prevent combos from shifting on pallets, Cargill and FPL personnel testified that the weight of combos alone does not always prevent shifting.  The testimony showed that both entities had previously experienced shipments of beef combos that shifted, including other shipments from FPL to Cargill.  These shipments, however, constituted only a small fraction of the shipments of beef that FPL had shipped to Cargill.

89.     The Court can infer from the fact that only a small fraction of FPL shipments of beef have shifted that FPL's standard method of loading is reasonable.

31

But the Court cannot infer from that same fact that, in this instance, FPL followed its standard method of loading or that the loading of this particular Cargo did not cause the loss.

90.     Instead, the Court can infer from the evidence that FPL did <u>not</u> follow its standard method of loading here.  Specifically, the shipment contained twenty-one combos—an odd number.  The combos were loaded two per row in every row that is visible in the photographs.  But the rows at the front of the trailer cannot be seen in the photographs.  Because there was an odd number of combos, at some point not visible from the photographs there must have been a row with only one combo.  A row with a single combo creates an empty space in the trailer.  The empty space means that, if the driver must brake hard, the combos, notwithstanding their weight, may very well shift forward into that empty space.

91.     Mr. Lowe testified that to prevent this from happening FPL fills the void created by an odd number of combos with a stack of empty pallets.[27]  Scotlynn argues that, based on this testimony, the Cargo was loaded properly.  But Mr. Lowe only testified as to FPL's standard practices.  He did not have personal knowledge about the manner in which this particular shipment was loaded, and there is no

---

[27] Other witnesses testified as to the use of airbags rather than stacked pallets, with at least one witness testifying that a stack of pallets was misguided because of the added weight of the pallets.  But because there is no evidence that added weight caused the load shift, so as long as the empty space was filled with something to prevent the pallets from shifting forward when braking occurred, the Court must assume that FPL's standard procedure as testified to by Mr. Lowe would have prevented the damage to the Cargo here.

direct evidence that FPL followed its standard procedure.[28]  More importantly, the

very fact that the Cargo shifted is circumstantial evidence that FPL did <u>not</u> follow

its standard loading procedures in this instance and that the loaders made a

mistake.  As Titan's expert witness testified, if FPL had followed its standard

procedure here, the Cargo would not have shifted forward because there would not

have been any empty space that would have allowed the Cargo to shift.[29]  Even

---

[28] FPL's standard practice is to gather all documents related to a shipment that sustains damage during transit as part of its investigation into the cause of the damage.  The documents that FPL produced in discovery, however, did not include the load diagram or any document identifying the employees who loaded the Cargo, both of which typically would have been gathered as part of FPL's investigation.

[29] Scotlynn and Titan presented expert testimony of Michael Laws and Roger Shore, respectively.  Before trial, both parties moved to exclude the competing expert testimony under Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  (Docs. 108, 109.)  The Court denied the motions without prejudice, finding that the objections related to the weight, not the admissibility, of the evidence, and allowing the parties to raise the issues at trial.  (Doc. 123 at 2; Doc. 125.)  At trial, both parties objected to the testimony of the competing experts on a similar basis, and the Court reserved its ruling, noting that the weight accorded to the testimony would be explained in its order.  (Doc. 152 at 2-3; Doc. 153 at 1-2.)  At the outset, the Court finds that the parties satisfied the requirements of Rule 702 and <u>Daubert</u> as to any expert opinions of Messrs. Laws and Shore, and the motions to exclude or strike any opinions are due to be denied.

Further, as to the weight of the evidence, Mr. Laws opines that the combos shifted forward due to "repeated extreme and sudden braking" and that the "palletized packaging" suffered "severe lacerations."  (Doc. 108 at 9-13; Doc. 108-1 at 4-5; Doc. 147-115 at 82:1–84:3.)  However, as noted, even sudden or extreme braking would not establish negligence of the truck driver.  And despite damage to the outer packaging of the combos, there was no evidence of damage to the inner plastic bags or contamination of the beef.  Any other opinions as to causation and mitigation of damages are against the weight of the evidence and, in any event, insufficient to establish Scotlynn's claim under the Carmack Amendment.

As to Mr. Shore, as noted, the Court credits his testimony that the void created by the odd number of pallets caused the combos to shift.  (Doc. 147-120 at 21, 23; Doc. 110-3; Doc. 110-20.)  In any event, even if Mr. Shore's qualifications or

more, there is no evidence that any empty pallets were found in the trailer and none are visible in any of the photographs in evidence. Accordingly, because the Cargo did shift forward, there must have been an empty space that allowed for the load to shift during transit in normal driving conditions. The Court agrees with this analysis and infers that FPL's loaders left an empty space at the front of the truck when they loaded the odd number of combos and failed to follow FPL's standard practices of filling that void with a stack of pallets.

92. The truck driver could not see the combos that were loaded at the front of the truck as he looked into the trailer from the rear and therefore had no personal knowledge of the space that must have been left when FPL loaded the Cargo. No one from Cargill, FPL, or Scotlynn had personal knowledge as to how the combos at the front were loaded either. Mr. Borawski is the only witness who had any personal knowledge of how the combos at the front were loaded. And the Court credits his testimony. His knowledge is based on his personal observations when the combos were transloaded off the trailer for salvage. He testified that there was a space at the front of the trailer, which could not be seen until the combos at the back had been removed. Mr. Borawski's testimony supports the self-evident proposition that there must have been a space to allow the combos to shift when the driver braked during transit.

---

opinions do not satisfy <u>Daubert</u>, or exceeded the scope of the subject matter of Mr. Laws's opinions, <u>see</u> Fed. R. Civ. P. 26(a)(2)(D)(ii), his opinions were consistent with, and supported by, other record evidence. Accordingly, the exclusion of his opinions would not affect the disposition of Scotlynn's claims.

93.    The empty space that allowed the combos to shift was in the front of the truck, which the driver could not see from the ground looking into the back of the trailer.  The driver had no reasonable opportunity to inspect how the front of the trailer was loaded when the FPL employee called him to rear of the truck and immediately started closing one side of the doors.  Unlike FPL, he had no particular or specialized experience in loading combos of beef.  There is no evidence the driver had any general knowledge of proper loading methods for beef combos or had notice of any specific defect in FPL's loading.  He was not allowed to observe the loading of the Cargo, and there is no reason to infer that, had he climbed on top of the trailer to look at its interior, he would have been able to see the empty space or identify it as a potential problem.

94.    The Court also notes the testimony of Amber Kritsch, who worked for FPL for almost fourteen years and was the transportation and logistics manager for FPL from October 2014 through August 2017.  Her job responsibilities included booking trucks to ship meat loads and investigating and resolving claims related to transportation.  Ms. Kritsch testified that she had handled several other cargo loss claims where combos had shifted.  She was no longer employed by FPL at the time of her testimony.  The Court's impression was that she was an unbiased and neutral witness.

95.    Ms. Kritsch testified that, in her experience, shifted cargo was "rarely" a driver issue.  Ms. Kritsch also testified that, if the white straps on a tipped combo broke or popped off, it was FPL's custom and practice to assume that the cause of

the tipping was improperly placed strapping.  Ms. Kritsch was shown photographs of the shifted Cargo upon arrival in Wisconsin.  Pointing to the broken white straps on a tipped combo at the front of the trailer, and then to the bottom of a combo that had "busted out," Ms. Kritsch testified that, in her opinion, the pictures indicated that the cause of the tipped combos was "a shipping issue," as opposed to a driver slamming on the brakes or making an evasive maneuver.[30]

96.     Scotlynn's attorney attempted to discredit Ms. Kritsch's testimony on this point by showing her the written claim form she prepared and submitted to Cargill on FPL's behalf for loss of the Cargo, asking whether she would have submitted that claim to Cargill if she had thought at the time that the loss was caused by FPL.  The Court finds that this questioning did not credibly refute Ms. Kritsch's testimony because it is undisputed that FPL had agreed to accept timely redelivery of the Cargo.  Ms. Kritsch prepared and submitted the full loss claim to Cargill <u>after</u> FPL declined to accept redelivery of the Cargo due to an untimely redelivery date.  Therefore, FPL's submission of a claim to Cargill to recover for the Cargo loss is not evidence that FPL, or at least Ms. Kritsch, did not believe it was a loading error that caused the Cargo to shift.

---

[30] At one point in Ms. Kritsch's testimony, she agreed with Scotlynn's attorney's statement that, from the photographs, she could not see that FPL did anything that would have caused the combos to shift.  The Court does not believe this general admission negates or raises significant doubts as to Ms. Kritsch's more specific testimony that the photographs suggested to her that the Cargo shifted because the white straps had not been placed on the combos properly.

36

97.     The Court does not make any finding as to whether Ms. Kritsch's testimony is sufficient to establish by a preponderance of the evidence that FPL improperly packaged the combos, which contributed to their shifting.  Mr. Lowe's testimony seemed inconsistent with Ms. Kritsch's regarding the role played by the white straps on the combos.  Although Mr. Lowe did not specifically testify as to the white straps seen in the photographs of the Cargo, he described FPL's process for packaging the combos as including white tape, not straps, placed horizontally around the top of the combo to hold the plastic caps in place.  Ms. Kritsch testified that one of the reasons combos might shift toward the front of the trailer was incorrect strapping: if the straps on a combo broke, the weight of the beef inside the packaging would cause the combo to shift during transportation.  Shifting attributable to broken or improper strapping would be the fault of FPL, not the carrier.  But if the straps are instead tape as Mr. Lowe testified, it seems unlikely that improperly placed or broken tape, the purpose of which was merely to hold the plastic caps in place, could cause the combos to shift.

98.     Nevertheless, the Court does credit Ms. Kritsch's more general testimony that FPL typically would assume responsibility for damage to combos that appeared at the delivery destination in the condition shown in the photographs.  This testimony was credible because, in her position at FPL, Ms. Kritsch investigated and dealt with damaged shipment claims, and because FPL had agreed to accept redelivery of the Cargo when it was contacted by Cargill and shown photographs of the shifted combos.

37

## II.   CONCLUSIONS OF LAW

### A.   JURISDICTION

The Court has federal question jurisdiction over this matter pursuant to

28 U.S.C. § 1331 because the suit arises under the Carmack Amendment, 49 U.S.C.

§ 14706.  The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332

because there is complete diversity between the parties.  Scotlynn is a citizen of

Florida and Titan is a citizen of Illinois (Findings of Fact ¶¶ 1-2), and the amount in

controversy exceeds $75,000 (id. ¶ 83).[31]

### B.   GENERAL PRINCIPLES OF CARMACK AMENDMENT LIABILITY

The Carmack Amendment was enacted in 1906 as an amendment to the

Interstate Commerce Act of 1887.  Ward v. Allied Van Lines, Inc., 231 F.3d 135, 138

(4th Cir. 2000).  The Carmack Amendment provides:

> **(a) General liability**.—
>
> **(1) Motor carriers and freight forwarders.**—A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part.  That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading . . . for the actual loss or injury to the property caused by [the delivering or receiving carrier]. . . .  Failure

---

[31] The Court does not make any findings as to whether venue was proper in the Middle District of Florida.  To the extent that venue may have been improper, see 49 U.S.C. § 14706(d)(2); Pacer Glob. Logistics, Inc. v. Nat'l Passenger R.R. Corp., 272 F. Supp. 2d 784, 788-91 (E.D. Wis. 2003); Burger King Corp. v. Thomas, 755 F. Supp. 1026, 1029 (S.D. Fla. 1991), Titan waived that challenge, see Fed. R. Civ. P. 12(b), 12(h)(1); (Doc. 63 at ¶ 2).

> to issue a receipt or bill of lading does not affect the liability
> of a carrier. . . .

49 U.S.C. § 14706(a)(1) (emphasis added).

In short, the Carmack Amendment "makes common carriers liable for actual loss of or damage to shipments in interstate commerce." A.I.G. Uruguay Compania de Seguros, S.A. v. AAA Cooper Transp., 334 F.3d 997, 1003 (11th Cir. 2003); Ward, 231 F.3d at 138. Further, "[t]he Carmack Amendment was adopted to achieve uniformity in rules governing interstate shipments, including the rules governing injury or loss to property shipped." UPS Supply Chain Sol., Inc. v. Megatrux Transp., Inc., 750 F.3d 1282, 1285 (11th Cir. 2014) (citation omitted). Accordingly, the Carmack Amendment preempts state and common law claims against a carrier for loss or damage to goods during shipment. See Smith v. United Parcel Serv., 296 F.3d 1244, 1246 (11th Cir. 2002) (citations omitted). "[O]nly claims based on conduct separate and distinct from the delivery, loss of, or damage to goods escape preemption." Id. at 1248–49 (citation omitted).

A burden-shifting framework applies to a claim under the Carmack Amendment. A.I.G. Uruguay, 334 F.3d at 1003. First, the plaintiff must establish a prima facie case by demonstrating that: "(1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damage resulted." Id. (citing Fine Foliage of Fla., Inc. v. Bowman Transp., Inc., 901 F.2d 1034, 1037 (11th Cir. 1990)). If the plaintiff establishes a prima facie case, "the burden shifts to the carrier to prove (1) that it was free from negligence, and (2) that the damage to the cargo was

caused by one of five excusable factors: (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." Id. (internal quotation marks and citations omitted). "If the carrier cannot meet this burden, then liability is established." Id.[32]

### C.   THE LEGAL STATUS OF SCOTLYNN

As a threshold matter, the Court addresses the basis on which Scotlynn can assert a Carmack Amendment claim against Titan. Scotlynn initially brought suit under the Broker-Carrier Agreement. (Doc. 1 at ¶¶ 15-16.) But the judge previously assigned to this matter held that Scotlynn's breach of contract claim was preempted by the Carmack Amendment, and Scotlynn elected not to revisit the issue before trial.[33] (Doc. 61 at 11-13.)

---

[32] Titan argues in its trial brief that it is not liable because the damage to the Cargo was caused by Scotlynn's conduct. (Doc. 138 at 8.) Scotlynn's conduct, however, would not constitute one of the five excusable factors. Scotlynn's conduct, however, is relevant insofar as Scotlynn was acting on behalf of Cargill.

[33] The Eleventh Circuit has not yet decided whether a broker's claim against a carrier to recover for loss of cargo under the terms of a broker-carrier agreement is preempted by the Carmack Amendment. Several courts have held that such claims are not preempted by the Carmack Amendment. See, e.g., Exel, Inc. v. S. Refrigerated Transp., Inc., No. 2:10-cv-994, 2012 WL 3064106 (S.D. Ohio July 27, 2012); InTransit, Inc. v. Excel N. Am. Rd. Transp., Inc., 426 F. Supp. 2d 1136 (D. Ore. 2006); Edwards Bros., Inc. v. Overdrive Logistics, Inc., 581 S.E.2d 570 (Ga. Ct. App. 2003); cf. Razipour v. Joule Yacht Transp., Inc., No. 8:20-cv-729, 2020 WL 4904456 (M.D. Fla. Aug. 20, 2020) (claim for contribution against carrier with whom shipper contracted to prepare ship for transportation held preempted, distinguishing InTransit and Edwards because those cases involved contractual agreements between the broker and the carrier); but see Mecca & Sons Trucking Corp. v. White Arrow, LLC, Civil Action No. 14-7915, 2016 WL 5859018 (D.N.J. Sept. 16, 2016) (holding that broker's claims against carrier for negligence and indemnification were preempted by Carmack Amendment), aff'd on other grounds, 763 F. App'x 222 (3d Cir. 2019).

Further, Scotlynn's claim at trial was not a direct claim under the Carmack Amendment. As a broker in its dealings with Titan, Scotlynn cannot sue Titan on its own behalf under the Carmack Amendment. See Essex Ins. Co. v. Barrett Moving & Storage, Inc., 885 F.3d 1292, 1299 (11th Cir. 2018) ("If [the defendant] was a 'broker,' the Carmack Amendment does not apply . . ."); see also Mecca & Sons Trucking Corp. v. White Arrows, LLC, 763 F. App'x 222, 225 (3rd Cir. 2019) ("[T]he Carmack Amendment does not grant brokers a right to sue[.]").[34] Notwithstanding, Scotlynn can bring a Carmack Amendment claim as the assignee of "a person entitled to recover under the receipt or bill of lading." 49 U.S.C. § 14706(a)(1); UPS Supply, 750 F.3d at 1285 (logistics provider brought action against carrier as shipper's assignee).

The parties have stipulated that "Scotlynn is the assignee of Cargill's rights related to the load at issue in this case, including its claims under the Carmack Amendment." (Doc. 144 ¶ 14.) However, the stipulation does not specify the date of the assignment. There is a written assignment in evidence, which purports to assign the Cargo loss claim to Scotlynn "effective as of September 26, 2016." (Doc.

---

[34] The Carmack Amendment defines "broker" as "a person, other than a motor carrier or an employee or agent of a motor carrier, that as a principal or agent sells, offers for sale, negotiates for, or holds itself out by solicitation, advertisement, or otherwise as selling, providing, or arranging for, transportation by motor carrier for compensation." 49 U.S.C. § 13102(2). The Eleventh Circuit has held that, notwithstanding this definition, "a party is not a broker under the Carmack Amendment if it has agreed with the shipper to accept legal responsibility for that shipment." Essex Ins. Co., 885 F.3d at 1301. But Essex Insurance Co. does not affect the conclusion that Scotlynn cannot bring its own Carmack Amendment claim against Titan because its relationship to Titan was as a broker.

147-87.)  That written assignment was not executed until April 1, 2021, less than three weeks before trial.  "In order for an assignment with a retroactive effective date to be valid for standing purposes, the assignee must possess the assigned right on the day it filed the complaint."  MSP Recovery Claims, Series LLC v. QBE Holdings, Inc., 965 F.3d 1210, 1219 (11th Cir. 2020) (internal quotation marks and citation omitted).  Further, Scotlynn asserted in its trial brief without evidentiary support that Cargill "orally assigned" its Carmack Amendment claim, which was "memorialized in [the] written assignment."  (Doc. 139 at 3.)  But rather than acknowledge any oral assignment, the April 1, 2021 written assignment purports to effect an assignment nunc pro tunc.

In any event, the Court has before it the parties' stipulation that Cargill assigned its Carmack Amendment claim to Scotlynn.  While the parties did not stipulate as to the date of the assignment, Titan has not challenged Scotlynn's ability to bring a Carmack Amendment claim pursuant to the assignment.  The Court infers from this failure that the stipulation includes the fact that the assignment occurred prior to the filing of the complaint.  As a result, Scotlynn, as Cargill's assignee, can seek relief under the Carmack Amendment against Titan.[35]

---

[35] As an additional wrinkle, the evidence shows that on November 4, 2016 Scotlynn issued a check to Cargill, and that on November 23, 2016 FPL credited Cargill for the Cargo loss.  (Findings of Fact ¶¶ 78, 79.)  There is no evidence, however, establishing that either act made Cargill whole or that the damages Scotlynn seeks as Cargill's assignee would constitute double recovery.  To the extent Cargill was completely reimbursed by either Scotlynn or FPL, after November 4 or 23, 2016, Cargill would have no Carmack Amendment claim against Titan to assign to Scotlynn.  (Findings of Fact ¶¶ 80-83); see Nova Info. Sys., Inc. v. Greenwich Ins. Co., 365 F.3d 996, 1004 (11th Cir. 2004) (finding that individuals had "no rights to

### D.   SCOTLYNN'S PRIMA FACIE CASE

To establish its prima facie case under the Carmack Amendment, Scotlynn must prove by a preponderance of the evidence that (1) the Cargo was delivered to Titan in good condition, (2) the Cargo arrived at Cargill's facility in damaged condition, and (3) a specified amount of damages resulted.  A.I.G. Uruguay, 334 F.3d at 1003.  It is undisputed that the first element is satisfied here.  (Findings of Fact ¶ 41.)  Therefore, the Court will address only the second and third elements.

#### 1.   *Arrival of the Cargo in damaged condition*

To establish the damaged condition of goods upon delivery, a plaintiff may rely on direct or circumstantial evidence.  Fuente Cigar, Ltd. v. Roadway Express, Inc., 961 F.2d 1558, 1560–61 (11th Cir. 1992).  "It takes very little direct evidence to satisfy the second element while it takes a much greater degree of circumstantial evidence."  Id. at 1561 n.6.

The only evidence in the trial record as to Cargill's rejection of the beef upon delivery is the testimony of Ms. Stegman, but that testimony provided no direct evidence that the beef was exposed or otherwise damaged or unfit for human consumption as a result of the shifting of the combos during its transit from Georgia to Wisconsin.  Ms. Stegman did not personally see or inspect the Cargo.  No witness

---

assign to" a party where they were reimbursed prior to assignment); cf. Ameriswiss Tech., LLC v. Midway Line of Ill., Inc., 890 F. Supp. 2d 189, 193 (D.N.H. 2012) (observing that award of market value of goods, while allowing party to retain the goods "and thus their salvage value," would result in impermissible partial double recovery under Carmack Amendment).  Titan does not raise this as a basis to reject Scotlynn's Carmack Amendment claim.  In any event, the Court finds the stipulation includes that the assignment preceded Scotlynn's issuance of a check for the Cargo to Cargill on November 4, 2016.

described from personal observation the condition of the beef upon its arrival at Cargill's facility.  And there was no evidence that an inspection by a food safety expert was performed, despite the fact that further investigation could have revealed whether there was a risk of or actual contamination.  (Findings of Fact ¶¶ 50-51.)  Cargill's policy to reject shipments based on an unsubstantiated potential of contamination is not evidence that the Cargo was actually contaminated—and to what extent—and thus damaged.  See Fraser-Smith Co. v. Chi., Rock Island & Pac. R.R. Co., 435 F.2d 1396, 1400 (8th Cir. 1971) (finding failure of proof on issue of damage to a shipment of corn where the only witness who testified as to its condition on arrival did so based on hearsay and did not himself see the corn or inspect it, and that evidence that goods were "unmarketable" did not establish that the goods were "totally worthless"); Mecca & Sons Trucking Corp., 2016 WL 5859018, at *4 (holding that shipment of cheese properly rejected due to repeated exposure to unsafe temperatures).

Whether the Cargo was damaged on arrival can be shown "by substantial and reliable circumstantial evidence alone." Fuente Cigar, Ltd., 961 F.2d at 1561. However, the only circumstantial evidence of damage to the beef is that the combos had shifted forward and partially tipped over, with the outer packaging damaged on two of the combos.  There is no evidence that the inner plastic bags were torn or unsealed, and the photographs are insufficient for the Court to infer that the beef was exposed. See, e.g., Penske Logistics, Inc. v. KLLM, Inc., 285 F. Supp. 2d 468, 472 (D.N.J. 2003) (finding evidence insufficient to prove that cargo was damaged

where admission that refrigeration unit was not on "does not shed any light on whether not having the refrigeration unit on actually damaged the product").

Nevertheless, despite the absence of evidence that the beef was damaged, the evidence showed that the Cargo as delivered needed to be reworked to fulfill its intended purpose. The evidence demonstrated that the combos had to be unloaded using methods unavailable to Cargill, inspected for breakage that could have exposed the beef sealed in the inner plastic bags, and, if there was no exposure, repackaged for redelivery. To perform these services, the cost of paying a third party would have been incurred, and some amount of beef would likely have been lost. In addition, the time required to rework the Cargo would likely have resulted in diminution in value to the beef. These facts are sufficient to satisfy Scotlynn's burden of showing that the Cargo was damaged when it was delivered. See Fuente Cigar, Ltd., 961 F.2d at 1561 (noting that to satisfy the second element, the plaintiff "must prove only that some damage occurred during" transit).

### 2.    *Specified amount of damage to the Cargo*

Scotlynn's prima facie case falters on the third element, which requires proof of "a specified amount of damages." A.I.G. Uruguay, 334 F.3d at 1003 (emphasis added); see also Fuente Cigar, Ltd., 961 F.2d at 1561 n.7 ("The amount of recoverable damages becomes relevant only when analyzing the third element."). Even though the Cargo sustained some damage during transit, due to Cargill's immediate rejection of the Cargo as worthless, Cargill's failure to have the load inspected at its facility by its on-site USDA inspector, and Cargill and Scotlynn's

45

other stumbling actions over the next several days, the Court is without a sufficient evidentiary basis to ascertain the extent of the damage to the beef when the Cargo arrived at Cargill's facility.  Simply stated, Scotlynn has failed to establish a specified amount of damages here.

Scotlynn's request for the entirety of the invoice price and contention that the Cargo was "worthless" are unavailing.  In this regard, Fraser-Smith Co., which involved a brokered shipment of corn, is instructive.  There, a delay in transit caused the corn to heat up and turn sour, and the shipment was rejected on arrival. 435 F.2d at 1398.  Although the carrier's delay damaged the corn, the court found "the more troublesome issue" to be "the rejection of the goods and the damages that were found against the carrier."  Id. at 1399.  The court explained:

> The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment.  Under such circumstances the consignee's obligation is not affected by the fact that the goods have been injured or damaged during transit, unless they are considered to be "totally worthless."

Id. (citations omitted).

Damaged goods are deemed "worthless" when they "are worthless for their intended purpose or worth only their salvage value."  Paper Magic Grp., Inc. v. J.B. Hunt Transp., Inc., 318 F.3d 458, 463 (3d Cir. 2003) (internal quotation marks and citation omitted).  The evidence refutes Scotlynn's contention that the Cargo was "worthless" and that Cargill was therefore not obligated to accept the Cargo. Indeed, Cargill rejected the beef not because the beef was contaminated, unfit for human consumption, or worthless; it rejected the Cargo because the Cargo could not

46

be unloaded at its facility in the condition in which it was delivered under Cargill's standard forklift unloading procedures.  Cargill's cursory inspection of the outer packaging of a few combos was insufficient to establish a total loss of a shipment. See Allied Tube & Conduit Corp. v. S. Pac. Transp. Co., 211 F.3d 367, 372 (7th Cir. 2000).  Further, there is no evidence or authority supporting a finding that any difficulty in unloading the combos due to their shifting rendered the Cargo worthless.  To the contrary, the Court finds that, as discussed above, the vast majority of the beef combos could have been reworked and redelivered, with loss of only a very small percentage of the beef and the cost of reworking the containers. Indeed, the very fact that FPL had agreed to accept the return of the Cargo undermines Scotlynn's contention that the Cargo as delivered by Titan was worthless.[36]

Ultimately, because of the improper rejection of the Cargo as "worthless," there is no evidence from which the Court can infer the market value of, or any other measure of damage to, the Cargo.  The salvage price obtained by Titan's insurer weeks later certainly did not represent the fair market value of the Cargo on the date that Cargill rejected it.  Indeed, this is supported by FPL's willingness on Friday to accept redelivery of the Cargo.  See Fraser-Smith Co., 435 F.2d at 1401

---

[36] The court explained in Fraser-Smith Co. that "[t]he proper measure of damage . . . is the difference between the market value of the undamaged goods as shipped . . . and the reasonable market value of the damaged product as delivered to the consignee[.]"  435 F.2d at 1402.  Delivery generally means "spotting of a shipment at the consignee's place of business . . . regardless of whether the consignee has accepted or rejected the goods.  See Intech, Inc. v. Consol. Freightways, Inc., 836 F.2d 672, 674 (1st Cir. 1987).

(finding that "the evidence conclusively shows that the ultimate salvage price obtained . . . at least two weeks after its delivery to the consignee . . . did not represent the fair market value of the corn on the date" the shipment was rejected).

In sum, unlike in <u>Fraser-Smith Co.</u>, "the record does [not] establish a range of discount values which would allow a trier of fact to ascertain the reasonable market value of the shipment at the time of its delivery" without resorting to conjecture and mere speculation.  435 F.2d at 1402.  Rather, due to Cargill's rejection of the Cargo as worthless and its and Scotlynn's subsequent actions, there is no basis to determine a specified amount of damages, absent conjecture or speculation.[37] Accordingly, the Court concludes that Scotlynn has not met its burden of proving a specified amount of damages suffered as a result of the delivery to Cargill.[38]

### E.   TITAN'S SHOWING OF SHIPPER ERROR

Even if Scotlynn has established a prima facie case, its claim fails because Titan was free of negligence and the damage to the Cargo was caused by shipper error.  <u>See</u> <u>A.I.G. Uruguay</u>, 334 F.3d at 1003.  The first question is whether Titan

---

[37] <u>See also</u> <u>S.C. Johnson & Son, Inc. v. Louisville & Nashville R.R. Co.</u>, 695 F.2d 253, 261 (7th Cir. 1982) ("Concededly there was some indication of damage [when delivered to the consignee], but damages may not be awarded on the basis of conjecture or speculation and the admitted fact of damage is insufficient to prove the amount of damage." (quotation and citation omitted)); <u>Hams Exp., Inc. v. Joseph Land & Co., Inc.</u>, 506 F. Supp. 209, 213 (E.D. Pa. 1980) (stating that, while "'the quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage," it is also "elementary that purely speculative damages cannot be recovered"), <u>aff'd</u>, 661 F.2d 914 (3d Cir. 1981).

[38] Cargill is, of course, free to establish its own business practices and procedures.  But its business practices do not dictate the rule of law that this Court is bound to apply.

has shown by a preponderance of the evidence that the proximate cause of the loss by the Cargo shifting during transit was the manner in which FPL loaded it. See Specialty Prods. Int'l, Ltd. v. Con-Way Transp. Servs., Inc., 410 F. Supp. 2d 423, 430 (M.D.N.C. 2006) (observing that the shipper's fault must be the "sole proximate cause of the loss" (citation omitted)).  The Court finds that Titan has met its burden. (See Findings of Fact ¶¶ 84-97.)

To rebut this showing, Scotlynn offered evidence that Cargill had received tens of thousands of shipments from FPL in which the combos had not shifted. Some courts have relied on similar evidence in rejecting a carrier's evidence of an error in shipper loading.  See, e.g., Specialty Prods. Int'l, 410 F. Supp. 2d at 431. But the evidence here showed that, while uncommon, shipments of beef combos had in the past shifted forward in the truck.  Moreover, the evidence showed that FPL has accepted responsibility for loading errors in the past, and that FPL agreed to accept redelivery of the Cargo when it first learned that the combos had shifted. Only later did FPL reject the beef due to the passage of time.  Finally, the evidence showed that the only way the Cargo could have shifted was that the unidentified individuals who loaded the trailer failed to follow proper procedures by filling the void created by the odd number of combos.

The truck driver's failure to write the notation "shipper load and count" on the Bill of Lading does not affect whether Titan has shown shipper error.  His admission that FPL handed him the Bill of Lading, even if he did not sign it, establishes carrier receipt of the Cargo and creates a rebuttable presumption that

the items listed were in good condition when received.  See Johnson & Johnson v. Chief Freight Lines Co., 679 F.2d 421, 422 (5th Cir. 1982); (Doc. 147-2 at 1, ¶ 8).  "If no shipper load and count or similar notations appear on the face of the bill of lading, that bill should establish the presumption that the damage or loss was not occasioned by an act of the owner or shipper, and the carrier should have the affirmative burden of establishing that the loss or damage was, in fact, so caused."  Johnson & Johnson, 679 F.2d at 422 (internal quotation marks and citation omitted).  As noted, Titan has met this burden, and the absence of a "shipper load and count" notation does not preclude a showing of shipper error.[39]

Finally, Titan has shown that its truck driver was not negligent or otherwise at fault in failing to conduct a sufficient inspection and discover FPL's loading error or in the manner in which he transported the Cargo.  The primary duty as to safe loading of cargo belongs to the carrier.  United States v. Savage Truck Line, Inc., 209 F.2d 442, 445 (4th Cir. 1953); see 49 C.F.R. § 392.9(a)(1), (b)(1)–(3) (requiring the driver of a commercial motor vehicle to inspect cargo and confirm it is secure before and during transport).  An exception is where the driver "of a sealed commercial motor vehicle . . . has been ordered not to open it to inspect its cargo" or where the vehicle "has been loaded in a manner that makes inspection of its cargo impracticable."  49 C.F.R. § 392.9(b)(4); see also Ala. & V. Ry. Co. v. Am. Cotton Oil Co., 249 F. 308, 311 (5th Cir. 1918) (finding carrier not liable where defect in rail

---

[39] See, e.g., Allied Tube & Conduit Corp., 211 F.3d at 370 (observing that the notation relates to shifting the burden of proof).

car could not have been ascertained); <u>Savage Truck Line, Inc.</u>, 209 F.2d at 445 ("When the shipper assumes the responsibility of loading, the general rule is that he becomes liable for the defects which are latent and concealed and cannot be discerned by ordinary observation by the agents of the carrier; but if the improper loading is apparent, the carrier will be liable notwithstanding the negligence of the shipper."); <u>White v. Dietrich Metal Framing</u>, No. 1:06-cv-554, 2007 WL 7049797, at *7–8 (E.D. Tex. July 5, 2007).

The evidence shows that FPL assumed the sole responsibility for loading the Cargo and that Titan's driver had no meaningful opportunity to inspect the Cargo. Further, to the extent necessary, the Court finds that the empty space at the front of the trailer constituted a latent or concealed defect that could not have been discovered by a reasonable investigation of the load.  (Findings of Fact ¶¶ 34-36, 91-92); <u>see</u> <u>Lobdell v. Masterbrand Cabinets, Inc.</u>, No. 06-10948, 2008 WL 2224094, at *3 (E.D. Mich. May 29, 2008) (finding sufficient evidence that loading error was not apparent to driver where "[t]he cargo filled the entire length of the trailer and was stacked from top to bottom and from side to side," and there was "no evidence that there were apparent defects in the stacking").

The Court concludes that Titan was not negligent or otherwise at fault in failing to uncover FPL's loading error.  There is also no evidence that the damage to the Cargo was caused by the truck driver driving in an improper manner.  (Findings of Fact ¶¶ 84-85.)  In summary, even if Scotlynn established its prima facie case, Titan has met its burden of proving shipper error, and Scotlynn's Carmack

51

Amendment claim thus fails.  The Court therefore enters judgment in favor of Titan on Count II.

### F.   MITIGATION OF DAMAGES

Even if Scotlynn proved its Carmack Amendment claim, the recoverable damages would be limited due to its failure to mitigate damages.  See Hector Martinez & Co. v. S. Pac. Transp. Co., 606 F.2d 106, 109 n.4 (5th Cir. 1979)[40]; see also Paper Magic Grp., Inc., 318 F.3d at 462–63; Fraser-Smith Co., 435 F.2d at 1399.  Titan bears the burden to prove that Cargill, or Scotlynn acting on Cargill's behalf, did not exercise reasonable diligence in mitigating its damages.  Eastman Kodak Co. v. Westway Motor Freight, Inc., 949 F.2d 317, 320 (10th Cir. 1991).

As to this issue, Scotlynn's evidence at trial focused on Titan's purported refusal to cooperate in returning the Cargo to FPL, which resulted in FPL refusing redelivery and a total loss of the Cargo.  The Court, however, has rejected the asserted factual bases of Scotlynn's contention that Titan refused to cooperate. (Findings of Fact ¶¶ 59-68.)  In any event, Titan had no duty to cooperate in the redelivery of the Cargo to FPL.

"It is well established . . . that when damaged but salvageable goods are tendered to the owner, the carrier's liability for further damages terminates."  Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 294

---

[40] Decisions of the Fifth Circuit decided prior to October 1, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

(4th Cir. 1990).  Further, "when the damaged goods arrive at the shipper's destination, the consignee has a duty to accept them and mitigate damages unless the goods are deemed 'totally worthless.'"  Id.  (citations omitted); see also Fraser-Smith Co., 435 F.2d at 1401 ("We are unaware of any rule that a carrier must attempt to mitigate the consignee's damage once the consignee has given notice to the carrier that it intends to abandon the shipment."); S.C. Johnson & Son, Inc., 695 F.2d at 258 (noting that rejection did not require carrier to return cargo to shipper).

Accordingly, Titan had no obligation to return the Cargo to FPL or otherwise attempt to mitigate Cargill's damages.  Further, it was Scotlynn that failed to ensure the Cargo was returned to FPL by Monday or inform Cargill on Friday that the return trip could not be made until Monday.[41]  And Cargill or Scotlynn should have taken immediate, reasonable steps to mitigate the Cargo loss if a Friday return trip was required but not possible.  For example, the combos could have been inspected and reworked locally.  The beef in the combos had a guaranteed "use by" date of Tuesday or Wednesday of the following week, meaning it would likely still be fit for human consumption even accounting for any additional time—albeit, sold

---

[41] The Broker-Carrier Agreement provided that "[i]n the event a shipment is rejected, in part or in whole, by the consignee, the Carrier shall immediately contact Broker and shall immediately follow Broker's instructions as to where to transport and/or otherwise dispose of the goods."  (Doc. 147-2 at 1, ¶ 4.)  However, Scotlynn does not explain how this provision relates to mitigation of damages as to a Carmack Amendment claim.  In any event, this provision cannot reasonably be interpreted as imposing a duty on Titan to return the Cargo on Friday when it had no available drivers until Monday.  (Id. ("Carrier shall transport and carry [the] goods without delay caused by anything within Carrier's control."); Id. at 4, ¶ 25 ("This Agreement is to be construed according to federal law governing transportation . . . .")).

at a discount.  Unlike in <u>Swift-Eckrich, Inc. v. Advantage Sys., Inc.</u>, 55 F. Supp. 2d 1280, 1288 (D. Kan. 1999), where the shipper's "determination that it was singularly unwise to sell the meat for human consumption [was] insufficiently controverted," the evidence here indicates that, notwithstanding the "use by" date, the beef was not necessarily unfit for human consumption or worthless beyond salvage value.  Yet the record reflects no effort by Mr. Marrapese to determine the Cargo's fitness for human consumption and only a single email on Monday indicating that he may have contacted two possible options.  (Doc. 147-64.)

In short, Cargill and Scotlynn failed to reasonably mitigate damages after FPL refused to accept redelivery of the Cargo.  Put differently, any damage that occurred to the Cargo as a result of the failure to timely return the Cargo to FPL was not "caused" by the Cargo shifting during transit.  <u>See</u> <u>Atl. Specialty Ins. Co. v. Digit Dirt Worx, Inc.</u>, 793 F. App'x 896, 900–01 (11th Cir. 2019) (noting that common carriers are liable for the "actual loss or injury to the property caused by the carrier" (internal quotation marks and citations omitted)).[42]  To conclude, even if Scotlynn proved Titan is liable, the recoverable damages would be limited to the damage to the beef during its transit and upon delivery to Cargill.  As previously discussed, there is simply no record evidence of that specified amount of damages.

---

[42] <u>See, e.g.</u>, <u>M. Golodetz Exp. Corp. v. S/S Lake Anja</u>, 751 F.2d 1103, 1112 (2d Cir. 1985) (where shipper allowed goods to sit after rejection, carrier not liable for "diminution in value between the moment [shipper] learned of [the consignee's] rejection and the time of the eventual sale"); <u>Pilgrim Distrib. Corp. v. Terminal Transp. Co.</u>, 383 F. Supp. 204 (S.D. Ohio 1974) (carrier not liable under Carmack Amendment for damage to wine incurred during storage following rejection).

### G.   SCOTLYNN'S CLAIM FOR ATTORNEY'S FEES AND COSTS

In Count I, Scotlynn raises a claim titled "Indemnity," in which Scotlynn first alleges that the Broker-Carrier Agreement requires Titan to "indemnify Scotlynn in the event of any '[l]oss, damage or delay in transit as to all goods which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee.'"  (Doc. 62 at 3, ¶ 15 (quoting Doc. 147-1 at 9 ¶ 12(c)).)  As discussed, however, Scotlynn's claim for indemnification as to the Cargo loss was previously determined to be preempted by the Carmack Amendment by a prior judge assigned to this case.  Nonetheless, that order noted a possible exception to preemption for "an intermediary's contract-based indemnity claim for attorney's fees and costs," and allowed Scotlynn to amend its complaint to seek attorney's fees and costs pursuant to the Broker-Carrier Agreement.  (Doc. 61 at 12-13.)

In Count I, Scotlynn does just that.  Specifically, in support of its request for "entry of a judgment against Titan . . . for costs, expenses and attorney fees," Scotlynn cites the following provision:

> Carrier shall pay all costs, expenses and attorney fees which may be expended or incurred by Broker or Broker's Customers in enforcing this Agreement or any provision thereof, including but not limited to Paragraph 12 above, or in exercising any right or remedy of Broker or Broker's Customers against Carrier, or in any litigation incurred by Broker because of any act of omission of Carrier under this Agreement.

(Doc. 62 at 3-4; Doc. 147-1 at 10, ¶ 22.)  Upon review, judgment in Titan's favor is also due on this claim.

First, although Scotlynn was granted leave to amend its complaint to seek attorney's fees and costs, that grant of leave did not constitute a final determination that Scotlynn's claim was not preempted or otherwise meritorious. To the contrary, Scotlynn has failed to present evidence that shows the indemnification claim as to attorney's fees and costs is not also preempted by the Carmack Amendment.

Indeed, the Eleventh Circuit instructs that "separate and distinct conduct rather than injury must exist for a claim to fall outside the preemptive scope of the Carmack Amendment." UPS Supply, 750 F.3d at 1289 (quotation and alterations omitted). Put simply, Scotlynn has not established separate and distinct conduct to support its claim for attorney's fees and costs under the indemnification provision. Rather, the basis of this claim is the same as the Carmack Amendment claim: the loss of the Cargo. Relying on UPS Supply, other courts in this district have found this insufficient to save a claim for attorney's fees and costs from preemption. See, e.g., League Logistics, LLC v. Windy City Carriers, Inc., No. 6:20-cv-369-ACC-LRH, 2021 WL 2907761, at *5 (M.D. Fla. Apr. 5, 2021) ("To the extent Plaintiff's claim relates to recovery of its attorney's fees and costs pursuant to indemnification under the parties' Broker/Carrier Agreement, Plaintiff has not met its burden of establishing that this claim is not preempted by the Carmack Amendment as a matter of law."); Scotlynn USA Div., Inc. v. Cold Ground Transp., LLC, No. 2:15-cv-152-FtM-38CM, 2016 WL 6066682, at *3 (M.D. Fla. Oct. 14, 2016). By contrast, the separate and distinct conduct in UPS Supply was premised on a "direct violation of express terms" of a "separate and ongoing agreement," namely alleged

56

subcontracting with another entity, which, if proven, could expose the intermediary to "legal jeopardy with its customer." 750 F.3d at 1294–95. There is no such conduct "separate and distinct from the loss of cargo" here. Id. at 1295. Accordingly, although Scotlynn was allowed to pursue the claim beyond summary judgment, the evidence at trial demonstrates that Count I is preempted.

And even if the claim for attorney's fees and costs under the Broker-Carrier Agreement's indemnification provision is not preempted, Scotlynn has not shown that indemnification as to attorney's fees and costs is warranted here. In Florida, an indemnitor need not indemnify an indemnitee unless the indemnitee is found to be without fault, or in other words, the indemnitee's liability is founded on the indemnitor's liability, not its own. Houdaille Indus., Inc. v. Edwards, 374 So. 2d 490, 492–93 (Fla. 1979); SEFC Bldg. Corp. v. McCloskey Window Cleaning, Inc., 645 So. 2d 1116, 1117 (Fla. 3d DCA 1994); see also Maseda v. Honda Motor Co., 861 F.2d 1248, 1257 n.15 (11th Cir. 1988) (observing that the "Florida Supreme Court has indicated that indemnity is appropriate only in situations where the indemnitee is wholly without fault and is haled into court solely due to the fault of another"); (Doc. 147-1 at 10, ¶ 25 (providing that the Broker-Carrier Agreement is to be construed according to Florida law)). Further, indemnification of a party for its own wrongful acts requires that the contract "express[es] such intent in clear, unequivocal terms." SEFC Bldg., 645 So. 2d at 1117 (citations omitted).

Here, Cargill and Scotlynn have not shown to be without fault in the loss of the Cargo, and neither faces liability founded on Titan's liability. Further, the text

of the Broker-Carrier Agreement did <u>not</u> express an intent in clear and unequivocal terms for indemnification as to attorney's fees and costs to apply in circumstances such as these.[43]  And Scotlynn points to no authority supporting the proposition that such an indemnification provision requires Titan to pay attorney's fees and costs to Scotlynn, despite Titan prevailing as to the underlying, assigned claim.

In summary, indemnification as to attorney's fees and costs is not warranted, and judgment is due to be entered in Titan's favor on Count I.[44]

## CONCLUSION

In the words of the Seventh Circuit, "[t]he interstate shipment of goods is a complicated business." <u>REI Transport, Inc. v. C.H. Robinson Worldwide, Inc.</u>, 519 F.3d 693, 695 (7th Cir. 2008).  This case illustrates the point.  One cargo of raw beef shifted in transit and, over the ensuing years, gave rise to conflicting claims among four entities, each potentially with its own duties and obligations under statute, common law principles, and contractual relationships.  Sorting through these layers has not been an easy task.  With this order, the case may finally come to an end.

---

[43] Although the Broker-Carrier Agreement required Titan to "defend" Scotlynn, (Doc. 147 at 9, ¶ 12), Scotlynn brought suit against Titan, <u>as Cargill's assignee</u>. <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Rountree Transp. & Rigging, Inc.</u>, 286 F.3d 1233, 1261 (11th Cir. 2002) (noting distinction between indemnification and duty to defend claims).  In any event, as pleaded in Count I, Scotlynn has not sought to enforce any such contractual duty.  Rather, Scotlynn does not rely upon the agreement's language relating to a duty to defend, and the indemnification claim is limited to a request for attorney's fees and costs.

[44] The issue of whether Titan is entitled to attorney's fees and costs is not before this Court.  Any such request must comply with the Local Rules of the United States District Court for the Middle District of Florida.

Following a bench trial and extensive review of the thousands of pages of record evidence, the Court finds that Titan is not liable to Scotlynn for the loss of the Cargo or indemnification as to attorney's fees and costs.

Accordingly, the Clerk of Court is **DIRECTED** to enter final judgment as to all counts against Plaintiff Scotlynn USA Division, Inc., and in favor of Defendant Titan Trans Corporation.

**DONE AND ORDERED** this 20th day of August, 2021.

JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record